**MOLINA v. SOVEREIGN CAMP, W. O. W.**

Civ. No. 152.

District Court, D. Nebraska,
Omaha Division.

Feb. 15, 1947.

Harry Shackelford and George Mecham (of Rosewater, Mecham, Shackelford & Stoehr), of Omaha, Neb., for plaintiffs.

Raymond Crossman (of Brown, Crossman, West, Barton & Fitch), and William E. Mooney, both of Omaha, Neb., for defendant.

DONOHOE, District Judge.

This is an action by Manuel Maria Molina, Mariano Laris and La Protectora, S. A., a corporation, against the Woodmen of the World Life Insurance Society (former corporate name "Sovereign Camp of the Woodmen of the World"), a corporation, for an accounting and other relief.

Lengthy pleadings, necessitated by the complexities of the case, having been filed, an attempt to record an analysis of the allegations in these pleadings will not be made. However, stated in the briefest of terms, it may be said that the ultimate object of the action is to compel the defendant to make restitution for an alleged deficiency claimed to have existed in reserves which were required to be maintained in the Republic of Mexico by the defendant while it was engaged in the insurance business in that country.

The case having been tried to the court upon a stipulation of facts, plus oral and documentary evidence, the court now makes the following special

Findings of Fact

1. The defendant is, and has been since before 1926, a fraternal benefit society incorporated under the laws of the State of Nebraska without capital stock and carrying on its activities solely for the mutual benefit of its members and their beneficiaries, and not for profit, and engaged in the business of issuing participating policies of life and endowment insurance to its members.

2. In 1926, the defendant, with authorization and consent of the government of the Republic of Mexico, extended its operations into that Republic and established a branch office and general agency in Mexico City. The defendant continued to engage in the insurance business in Mexico until December 16, 1933, and between 1926 and December 16, 1933, inducted into its membership, and issued participating policies of life and endowment insurance to, a large number of citizens of that country, including the individual plaintiffs, Manuel Maria Molina and Mariano Laris.

3. The business of the defendant in the Republic of Mexico was under the direction and supervision of the defendant's general agent, one Enrique V. Anaya, who transacted all of the defendant's business in Mexico.

4. The individual plaintiffs, Manuel Maria Molina and Mariano Laris, were and now are residents and citizens of the Republic of Mexico, and each of them was a member and policyholder of the defendant on and prior to December 16, 1933, and each is now a policyholder in the corporate plaintiff, La Protectora, S. A.

5. The corporate plaintiff, La Protectora, S. A., is a stock insurance corporation organized under the laws of the Republic of Mexico under the name of "Los Lenadores del Mundo en Mexico, S. A." (Woodmen of the World in Mexico, Stock Company) by an instrument dated October 25, 1933. This corporation has continuously existed and transacted business in Mexico under its original articles of incorporation and by-laws and amendments and modifications thereof and has, since June 22, 1935, transacted business under its present name of "La Protectora, S. A."

6. The defendant, in the due and regular course of its business, determined to dispose of its property in Mexico and to withdraw from business in that country. With this purpose in mind, the defendant's Sovereign Camp, its supreme legislative and governing body, at a regular biennial meeting held in Chicago in July, 1933, adopted a resolution recommending that the defendant's president be authorized to perform such acts as mights be necessary to discontinue the defendant's business in Mexico. Enrique V. Anaya attended this meet-

ing and participated in the proceedings of said meeting.

7. The defendant's president, acting pursuant to authority conferred by the resolution of the Sovereign Camp, and without any purpose or intent to cheat or defraud the government of Mexico, the policyholders in that country, or any other person, attempted to find some lawful buyer for the defendant's Mexican business. He also authorized Anaya to negotiate for a lawful sale of that business or to organize a legal insurance corporation in Mexico, which would be lawfully organized and authorized to take over the defendant's business in that country.

8. In furtherance of the defendant's purpose to dispose of its business in Mexico, and to withdraw from that country, the defendant's board of directors, at a regular and formal meeting held in Omaha in September, 1933, determined and voted to sell the defendant's Mexican business after being advised that Anaya had been unable to sell the business, but that he had in process of organization an insurance corporation which would be legally organized in Mexico under the name of "Los Lenadores del Mundo en Mexico, S. A.", and which would be legally authorized to accept a transfer of the defendant's business. (Plaintiffs' Exhibit 24)

9. The defendant's board of directors, in this same meeting, adopted a resolution authorizing the defendant's president to sell to the corporation formed by Anaya in Mexico all of the defendant's insurance business and property in that country, including the defendant's reserves as filed and deposited with the Mexican government, and cash deposits and credits in any bank in Mexico at the date of the sale. (Plaintiffs' Exhibit 24)

10. The purpose of the defendant and its officers and directors in selling the defendant's business in Mexico and withdrawing from that country was in all respects lawful. All of their acts in connection with the disposition and sale of the business were performed in carrying out a good faith attempt to find a legitimate purchaser for the business and were free from any taint of fraud, conspiracy or other unlawful purpose.

11. At or about the time of the meeting of the defendant's Sovereign Camp in Chicago, Enrique V. Anaya formulated and conceived a secret plan and scheme to cheat and defraud the defendant, the government of Mexico, and the policyholders, and to personally acquire the defendant's Mexican business by organizing a fraudulent and fictitious corporation as will more fully appear in these findings. Anaya conspired and confederated with on Guerrero, who aided and assisted him in the furtherance of said conspiracy by committing the overt acts appearing in the special findings hereinafter made.

12. Under the laws of the Republic of Mexico, which were in effect while the defendant was engaged in the insurance business in that country, foreign insurance companies, such as the defendant, were required to submit to the Secretariat of Industry, Commerce and Labour detailed annual financial reports covering their operations in Mexico. During the time when the defendant operated in Mexico, the laws of that country also required the defendant to constitute or establish and maintain within Mexico: (a) technical reserves for policies in force; (b) reserves for liabilities pending under matured policies and for losses which had occurred; and (c) contingent reserves to cover fluctuations in securities and variations in statistical estimates. The laws of Mexico also required that, for the protection of policyholders in, Mexico, insurance companies such as the defendant should keep these reserves invested within the Republic of Mexico in authorized and approved securities and that documents, such as bonds and other instruments, evidencing the existence of these reserves should not leave the country.

13. Under the laws of Mexico, the reports and annual statements of a foreign insurance company were required to be signed by designated officers of the company, including the local representative in Mexico.

14. The annual report covering the defendant's operations in Mexico for the year ending December 31, 1932, was prepared in the defendant's home office in Omaha, Nebraska. This report was forwarded from Omaha to Enrique V. Anaya in Mex-

ico City with a letter dated August 1, 1933, instructing Anaya to affix his signature to the report and insert the proper date at the time of doing so.

15. Instead of filing the annual report received from the defendant's home office, Enrique V. Anaya, acting in collusion with the said Guerrero, for the purpose of carrying out said unlawful scheme and plan to cheat and defraud the defendant and the government of Mexico, and to personally acquire the defendant's Mexican business, caused to be prepared and filed a false and fraudulent report to which was attached a sheet bearing the signatures of the defendant's officers; this sheet having been torn off by Anaya from the report as correctly prepared by the defendant in its home office, and forwarded to Anaya for his signature. This false and fraudulent report, which was dated August 18, 1933, showed a smaller amount of insurance than was actually in force in Mexico, thereby showing a corresponding reduction in the amount of reserves required to be maintained in that country.

16. In furtherance of the same unlawful scheme and plan to cheat and defraud the defendant and to personally acquire the defendant's Mexican business, Anaya and the said Guerrero caused other false and fraudulent reports, including reports of the valuation of the mathematical reserves for the defendant's business in Mexico for the year ending December 31, 1932, and the first 11 months of 1933, to be prepared and filed with the insurance department in Mexico. The evidence does not show that these reports were signed by the defendant's officers.

17. All of these acts by Anaya and the said Guerrero, as set forth in special findings 15 and 16, were performed by these persons while acting outside and beyond the scope of their authority and employment and without notice or knowledge of the defendant, and such acts were studiously concealed from the defendant's notice or knowledge.

18. To accomplish and carry out his purpose in organizing a fictitious corporation to perpetrate and conceal his fraud and to personally acquire the defendant's business in Mexico, Enrique V. Anaya gathered a group of relatives, close friends, and employees, including Guerrero and one Basham, a member of the law firm of Basham & Ringe, in Mexico City. On October 25, 1933, these persons appeared before a notary public in Mexico City and, as original incorporators and stockholders, executed a formal written instrument consisting of articles of incorporation and by-laws for the formation of a limited liability stock company known as "Los Lenadores del Mundo en Mexico, S. A."

19. The group comprising the original incorporators and stockholders of Los Lenadores del Mundo en Mexico, S. A., included Enrique V. Anaya, his wife, his daughter, a son, and at least two employees, including the aforesaid Guerrero. These persons subscribed for 2,100 of the 3,000 shares of stock in the corporation and, because of the relationship, were especially subject to the will of Anaya, thus permitting him in truth and in fact to own and control the corporation.

20. This corporation which was to exist for a term of 50 years was, by express provision of its articles of incorporation, organized for the specific purpose of acquiring the defendant's business in Mexico, including the defendant's assets and debits, the defendant's insurance in force, the defendant's deposits, reserves, office and files. the articles further recited that the new company agreed to perpetuate its insurance business and to nationalize the same, thereby assisting the Mexican government in the realization of its nationalistic aims.

21. Although capitalized in the amount of 300,000 pesos, the capital of Los Lenadores del Mundo en Mexico, S. A., was largely "water" at the time of its organization. Contrary to recitals appearing in the articles of incorporation showing that all of the stock had been fully paid for by the incorporators and stockholders, and that the sum of 300,000 pesos had been deposited with the treasurer of the corporation, only a small part of that sum was actually paid into the corporation.

22. All of the fraudulent and wrongful acts which were purportedly performed and accomplished by and in the name of the corporation, Los Lenadores del Mundo en Mexico, S. A., were in fact the acts of

Enrique V. Anaya; the corporation being a mere instrumentality in his hands created for the purpose of carrying out and concealing his fraudulent intent and purpose.

23. All of the acts performed by Enrique V. Anaya in organizing his corporation were performed in an individual and personal capacity and not as an agent for the defendant. Neither the defendant nor any of its directors, officers or agents were connected or associated with the formation of this corporation in any way; nor was the defendant or any of its directors, officers or agents guilty of any fraud, conspiracy or other wrongful conduct in connection with organizing the corporation.

24. Under the laws in force in Mexico in 1933, an insurance company desiring to transfer the total of its insurance in force to another company, thereby being exempt from responsibility toward its policyholders, was required to obtain permission of the Secretariat of Industry, Commerce and Labour. Authority for the transfer could be granted only if: (1) the transfer was made without prejudice to the interests of the assured parties, (2) the company assuming responsibility guaranteed the amount of its new engagements according to law, and (3) a majority of the holders of policies to be transferred expressly approved the transfer in the form laid down in the insurance regulations.

25. Insurance companies desiring to transfer their business in Mexico were required, by the laws and insurance regulations in force in that country, to call a meeting of their policyholders by notice published in an official newspaper. These laws and regulations further required that at least 51% of the policyholders should be present, either in person or by proxy, at such meeting; that resolutions should be carried by a majority vote of two-thirds of those present; and that the meeting should be held under the supervision of a representative of the insurance department.

26. Steps to secure approval from the proper agency of the government in Mexico for the transfer of the defendant's Mexican business were taken by Enrique V. Anaya.

27. A meeting of the defendant's policyholders in Mexico was called on November 10, 1933, for the purpose of considering whether the defendant's business in Mexico should be nationalized and transferred to Anaya's corporation; Anaya having previously caused a notice of this meeting to be duly published in an official newspaper.

28. On the day preceding the scheduled meeting of policyholders, an inspector from the insurance department went to the defendant's office in Mexico City for the purpose of inspecting the defendant's records to determine the number of policyholders entitled to attend and vote at the meeting. These records were in the form of cards which were under the supervision and control of the said Guerrero who, with Anaya, knew in advance that the inspector was coming to check the cards.

29. At the time of the policyholders' meeting, the said Guerrero was acting in a dual capacity. He was holding a high office in the Department of Public Treasury, in which the Mexican Insurance Department was then located, and also working as a part time accountant and actuary in the defendant's office in Mexico. By virtue of his position, the said Guerrero was especially able to aid and assist Anaya in the furtherance and perpetration of his fraud and conspiracy.

30. On the basis of the records which were made available to him on November 9, 1933, the inspector, and Anaya, certified that there were then 878 policyholders whose policies were in force and who were entitled to vote at the policyholders' meeting. At the meeting held on the following day, 21 policyholders attended in person and 445 were represented through proxies running to those actually present. The vote in favor of transferring to the new corporation was practically unanimous.

31. Neither the defendant nor any of its officers or directors were guilty of any conspiracy, fraud or other wrongful conduct in connection with the policyholders' meeting.

32. The Department of Insurance in Mexico, by its rulings and orders, approved the legality of the policyholders' meeting;

approved and authorized the transfer of the defendant's insurance and liabilities in Mexico to Anaya's corporation; authorized this corporation to engage in the insurance business in Mexico; and terminated the defendant's authority to continue in the insurance business in that country. As of the time of the trial of this case, these rulings and orders had not been vacated or modified and were still in force.

33. A formal written contract, dated December 16, 1933, between the defendant, acting by its president, and Los Lenadores del Mundo en Mexico, S. A., acting by Anaya, was executed by these parties before a notary public in Mexico City. Under this contract, the defendant sold and transferred to Los Lenadores del Mundo en Mexico, S. A. all assets and liabilities of the defendant's Mexican branch, composed of: all policies of insurance issued since 1926; mathematical reserves; a hypothecary credit in the amount of 16,000 pesos; all furniture, records and other supplies in the defendant's Mexican office; deposits existing in the Bank of Mexico; funds in cash in the treasury of the Mexican branch; the contract of rental on the defendant's office in Mexico City, and any other credits or debts which the defendant might then have to its credit or owe the Mexican branch.

34. By express provision of this contract of sale, the defendant was released from all obligations which it had contracted in Mexico by reason of its insurance operations, and Los Lenadores del Mundo, en Mexico, S. A. accepted the contract and recognized and assumed it in its totality, offering to comply with it to the letter.

35. This contract, with a check made payable to the order of the defendant's vice-president, and signed by the defendant's president and secretary, in the amount of approximately 56,000 pesos, representing money under the defendant's control in the Bank of Mexico, were deposited in escrow to be delivered subsequently if Los Lenadores del Mundo en Mexico, S. A. could meet the requirements and conditions of the contract; the new corporation not having received its formal charter from the government of Mexico at the time of the delivery in escrow.

36. The check to which reference is made in special finding 35 was endorsed by the defendant's vice-president to the order of Los Lenadores del Mundo en Mexico, S. A. It was subsequently endorsed "Los Lenadores del Mundo en Mexico, S. A." by E. V. Anaya, president, and then by E. V. Anaya personally. The proceeds from this check were not received by the corporation but were converted by Anaya to his own use.

37. Neither the defendant nor any of its officers, directors or agents profited or benefited in any way by the fraud perpetrated by Anaya.

38. Anaya's corporation, Los Lenadores del Mundo en Mexico, S. A., was granted a formal charter by the Mexican government on March 1, 1934. A notice, dated June 2, 1934, was published in the Diario Official, an official newspaper in Mexico, stating that the defendant's authority to do business in Mexico had been cancelled since March 1, 1934, and that the defendant's obligations in that country had been taken over and assumed by Anaya's corporation.

39. Under the practices and customs prevailing in Mexico, stock in corporations is originally issued in the subscribers' names, and thereafter treated as being owned by the bearers. It is sold and transferred without any record by the corporation. These customs existed with respect to stock in the corporate plaintiff.

40. The corporate plaintiff was under the domination and control of Enrique V. Anaya as its president and majority stockholder until the late part of 1938 or early 1939. This plaintiff's present president and majority stockholder, Rudolph S. Otto, who is a man of education and experience and specially trained in the field of insurance, was employed by Enrique V. Anaya in 1935 and was elected general manager of the plaintiff corporation in 1936. The said Otto acquired control of the corporate plaintiff by buying the majority of its stock in the late part of 1938 or early 1939. At the time when he bought this stock, Otto either knew, or in the exercise of reasonable diligence should have known, of facts and records disclosing the fraud practiced

by Anaya and his confederates and showing that the corporate plaintiff had been used as an instrumentality for the perpetration of fraud.

41. All of the corporate plaintiff's present stockholders, except Enrique V. Anaya, who now owns 67 shares through his committee or guardian, acquired their stock long after the commission of the acts of which complaint is now made in this action.

42. The contract of transfer, dated December 16, 1933, has been assumed and performed by the corporate plaintiff, and the deficiency resulting from the fraudulent embezzlement and diversion of money, reserves and securities by the aforesaid Anaya and his associates, has been restored to the Insurance Department of Mexico. The corporate plaintiff is now, and was at the time of the commencement of this action, in a sound financial condition and has paid dividends to its stockholders for 1944 and 1945. This plaintiff's present policy-holders are now in a position equivalent to, or better than, the position in which they would have been had no fraud been perpetrated by Anaya.

43. All of the persons in Mexico holding policies of the defendant as of November 10, and December 16, 1933, and whose policies are now in force with the corporate plaintiff have, since December 16, 1933, paid their premiums to this plaintiff, and these premiums have been accepted by it.

44. As of the date of the contract transferring the defendant's business in Mexico to Los Lenadores del Mundo en Mexico, S. A., the terminal reserve on the policy of the plaintiff Laris was 212 pesos and 16 cents. On October 13, 1934, which was after the transfer, Laris obtained a loan of 240 pesos on his policy from the corporate plaintiff. No part of this loan had been paid as of the time of the trial of this case.

45. As of the date of the contract transferring the defendant's business in Mexico to Los Lenadores del Mundo en Mexico, S. A., the plaintiff Molina held two policies, each of which then had a terminal reserve of 134 pesos and 56 cents. In February, 1934, which was after the transfer, Molina obtained a loan of 121 pesos on each policy from the corporate plaintiff. No part of either of these loans had been paid as of the time of the trial of this case.

46. The rate of exchange between Mexican pesos and the American dollar on November 10, 1933, was approximately three and one-half pesos to one dollar.

47. Measured in terms of American money, the interest of the plaintiff Molina in the reserves sought to be recovered in this action is approximately $7.40. The interest of the plaintiff Laris in these reserves is nil.

48. Aside from the two individual plaintiffs, only two or three other persons who held policies of the defendant at the time of the transfer of the defendant's business in Mexico, have any notice or knowledge of the bringing and maintaining of this action. The evidence adduced at the trial does not show that other policyholders are making or asserting claims in this action.

49. The plaintiffs in this action do not fairly insure adequate representation of the policyholders but are, in truth and in fact, the representatives of Rudolph S. Otto who selected and induced the individual plaintiffs to lend and contribute their names for his use in the bringing of this action.

50. The individual plaintiffs cannot maintain this action as representatives of a class, and the individual claims of these plaintiffs is not sufficient to confer jurisdiction upon this court.

## Opinion

The individual plaintiffs, Molina and Laris, have brought this action for their own benefit, and also as a class action on behalf of all others similarly situated as former members and policyholders in the defendant in Mexico at the time of the transfer of the defendant's Mexican business and who are now policyholders in the corporate plaintiff La Protectora, S.A., brings the action for its own benefit and also as a class action on behalf of those represented by the individual plaintiffs.

We shall consider first the standing of the plaintiffs to maintain this suit as a class action.

Rule 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides:

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, *such of them, one or more, as will fairly insure the adequate representation of all* may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought." (Emphasis added.)

This rule prescribes certain definite prerequisites for class actions. One of those requirements is that the persons constituting the class must be so numerous as to make it impracticable to bring them all before the court. That situation seems to exist here since, according to allegations in the amended complaint and evidence offered at the trial, the class which the plaintiffs claim to represent consists of over 1,000 persons, all of whom apparently reside in Mexico.

■ Another and further requirement laid down by the express language of the rule is that the persons bringing an action as members of a class must be: "such of them, one or more, as will fairly insure the adequate representation of all". Under this language of the rule, "It is a condition precedent to the existence of a right to maintain a class suit that the court find that the plaintiff's suit will fairly insure the adequate representation of all. This raises a question of fact for the trial court upon which it passes judicially. It has therefore always been a question in class suits to be determined on the particular facts in each case whether the parties to the

record, as such representatives, fairly represent the interest or right involved." 6 *Cyc.* of Federal Proc. 2nd Ed., Sec. 2310, pp. 418, 419. To the same effect, see Pelelas v. Caterpillar Tractor Co., 7 Cir., 113 F. 2d 629, certiorari denied 311 U.S. 700, 61 S.Ct. 138, 85 L.Ed. 454; Pacific Fire Ins. Co. v. Reiner, D.C.La., 45 F.Sup. 703.

One of the most frequently cited cases on the subject of adequacy of representation in class actions is Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84. In that case two jobbers of gasoline, on their own behalf and as representatives of a class of 900 jobbers, sought to maintain a civil, statutory action to recover treble damages for injuries caused by an unlawful combination with respect to fixing the price of gasoline in violation of the anti-trust laws. The district court dismissed the action on the grounds that: (1) the plaintiffs did not constitute a "class" within Rule 23 because they did not seek a "common relief"; (2) the plaintiffs did not insure the adequate representation of all members of the class, and (3) the plaintiffs had no cause of action in equity. The Circuit Court of Appeals concluded that the suit was properly dismissed as a class action, but that it should not have been dismissed as to the plaintiffs, individually. Circuit Judge Evans, writing for the court, said, 125 F.2d at page 91: "Whether plaintiffs meet the requirements of Rule 23 is the precise question we must answer. This rule calls for 'one or more' plaintiffs. In further defining the phrase 'one or more,' the Supreme Court, by this rule, said: 'as will fairly insure the adequate representation of all.' This qualifying phrase deals not alone with the number of plaintiffs. It calls for plaintiffs who can *insure the adequate representation* of all the others. The application of the rule to each case necessitates a study of the factual situation which is at the bottom of the asserted liability of defendants."

The reviewing court, while concluding that dismissal of the action was not justified on the ground that the plaintiffs were too few in number compared to the total number in the class, recognized that the plaintiffs' ability to insure adequate representation of the class was a matter rest-

ing largely in the trial court's discretion, subject only to review for abuse. See also Pelelas v. Caterpillar Tractor Co., D.C.Ill., 30 F.Supp. 173–176, affirmed 7 Cir., 113 F.2d 629, holding that whether the plaintiffs in a class action are such as will fairly insure the adequate representation of all the members of the class rests largely in the exercise of a sound discretion by the trial court.

In the Weeks case, the court, commenting upon proof which might have been, but which was not, offered by the plaintiffs to show their ability to insure adequate representation of the class, said, 125 F.2d at page 94: "They could, and should, have supplied some proof that others in the class desired this suit to go on and that they knew of few, or no instances, where the members of the class were opposed to the prosecution of this class suit. Affirmative notice could have been given by them to others in the class, showing that they had, by letter or by newspaper, brought the existence of the present suit to the attention of others of the class. The reaction of the others could have then been shown to the court. No one of these facts, in and of itself, would be completely determinative of plaintiffs' ability to maintain this suit. However, the test, the application of which this rule necessitates, calls for some enlightenment of the court."

That part of the court's reasoning previously quoted from the Weeks case, while not binding here, is instructive and persuasive, at least in the absence of authority more directly in point in the eighth circuit.

In Moore's Federal Practice, Vol. 2, at pp. 2234 and 2235, the author writes with respect to Rule 23(a): "Besides the absence of an expressed or hidden interest of the party or parties of record, the question of adequate numerical representation (the number appearing on record as contrasted with the number in the class) should be considered by the trial court. There is no one percentage of the class that must be parties on the record. The mere number should not be the criterion. While three out of two hundred subscribers to a fund were held to be insufficient, one on behalf of all citizens of a town was representative.

The safest rule seems, again, to be that there must be a showing of representation that will satisfy the court that the interests of the absentee parties will be adequately protected by the representative, plaintiff or defendant. This doctrine is clearly recognized by subdivision (a) of the rule under discussion."

In the instant case, we have two individual plaintiffs, only one of whom offered any evidence at the trial, striving to maintain a class action on behalf of a class allegedly consisting of more than 1,000 persons. It must be observed that: (1) the plaintiffs are claiming to be entitled to recover a fund in the amount of approximately $50,000, and (2) the evidence establishes that one of the individual plaintiffs has no interest in this fund, and that the other individual plaintiff's interest therein amounts to about $7.40. Thus, it is apparent that the interest of the individual plaintiffs, as compared with the entire amount sought to be recovered, is so small as to be negligible. Cf. Central West Public Service Co. v. Craig, 8 Cir., 70 F.2d 427.

From the allegations of the amended complaint, by which the plaintiffs are bound, it appears "that none of said policyholders, with the exception of the individual plaintiffs herein, have been apprised of the fraud worked upon them in the transfer of assets and libilities as above described * * *". According to the testimony of the corporate plaintiff's president and majority stockholder, Otto, notice or knowledge of the bringing of this action and of the claims asserted herein has been purposely withheld from all of the defendant's former members in Mexico (the class allegedly represented by the plaintiffs) except Molina and Laris and two or three other intimate friends of Otto.

The plaintiff Laris testified on direct examination that he first learned of the matters of which complaint is now made when he was approached by Otto and Guerrero. The matters of first asserting claims against the defendant, engaging the plaintiffs' lawyers, selecting the forum, collecting the plaintiffs' evidence and actively prosecuting this case have all been in the hands and under the control of Otto, who is the corporate plaintiff's president and ma-

jority stockholder. None of the defendant's former members in Mexico, except the plaintiffs Molina and Laris, have asserted or made any claims in this case. Indeed, from what appears in the evidence, the remaining members of the class have been denied the opportunity of doing so by those who now claim to represent them.

■ This case is one wherein the corporate plaintiff's president and majority stockholder, the person who is now most vigorously prosecuting this action, and who is the one primarily interested in its outcome, has solicited and induced the individual plaintiffs to authorize him to bring the action in their names, supposedly as a class action on behalf of others. Under the evidence it must be concluded that the action, in so far as the individual plaintiffs are concerned, has really been brought in the interest of Otto, rather than in the interest of a class of policyholders supposedly represented by the individual plaintiffs.

■ This suit cannot be maintained as a class action by the corporate plaintiff nor by its president and majority stockholder, Otto. The latter clearly represents his corporation, not its policyholders, and it is not asserted that he was a member of the class of former policy-holders on whose behalf the action is brought. But even if Otto were a member of the class, he would be in no position to fairly insure the adequate representation of all since his interests, as president and majority stockholder of the corporate plaintiff, would conflict with the interests of other members of the class. The interests of one maintaining a suit as a representative of a class must not conflict with the interests of others in the class. Clark v. Chase Nat. Bank of City of New York, D.C.N.Y., 45 F.Supp. 820; Moore's Federal Practice, Vol. 2, Section 23.03, at pp. 2232, 2233.

In Hansberry v. Lee, 311 U.S. 32, at pages 44, 45, 61 S.Ct. 115, at page 119, 85 L.Ed. 22, 132 A.L.R. 741, Justice Stone said: "It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation. (Citing cases.) It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class, so that any group merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires. The doctrine of representation of absent parties in a class suit has not hitherto been thought to go so far. (Citing cases.)"

■ The corporate plaintiff has no standing to maintain this suit as a class action on behalf of the defendant's former members in Mexico since this plaintiff obviously is not a member of the class which it would represent. La Protectora, S.A., itself having no cause of action as a member of the class, may not now come in as a mere volunteer or friend and maintain the suit on behalf of the parties in interest.

Under the evidence in this case, and the authorities previously cited, the court holds that neither the individual plaintiffs nor the corporate plaintiff are such persons as will fairly insure the adequate representation of all of the class which they now seek to represent within the meaning of Rule 23(a), and that the plaintiffs cannot maintain this suit as a class action.

The case for the plaintiffs will now be approached from the standpoint of the action as brought for their own benefit. We shall first consider the case for the individual plaintiffs.

■ Jurisdiction in this action rests upon diversity of citizenship and the existence of a controversy involving the statutory minimum amount. This court has previously said in Kissick Construction Co. v. First National Bank of Wahoo, D. C., 46 F.Supp. 869, at page 871, that.

"In cases where jurisdiction is derived from diversity of citizenship coupled with a controversy involving a statutory minimum amount, it is the sum actually claimed in good faith by the plaintiff when he files

his complaint which determines the jurisdiction of the court and the fact that the plaintiff may not succeed in recovering all that he seeks in good faith will not affect the jurisdiction of the court. (Citing cases.) Citations in great number might be added, but there seems to be no dissent upon the suggested point.

"It is true that where, through bad faith elements or causes of action are introduced for the manifest purpose of inflating a claim to a point above the jurisdictional minimum, jurisdiction will be denied. Bank of Arapahoe v. David Bradley & Co., 8 Cir., 72 F. 867. 'By good faith is meant that the sum demanded in the pleading is the real matter put in dispute, and not so clearly fictitious as to make it legally certain that the amount alleged was merely to confer jurisdiction because clearly beyond reasonable expectation of recovery.' Miller-Crenshaw Co. v. Colorado Mill & Elevator Co., 8 Cir., 84 F.2d 930, 932."

The rule was concisely stated in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, at pages 288 to 290, 58 S.Ct. 586, 590, 82 L.Ed. 845, where the Supreme Court said: "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, *or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.* Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." (Emphasis added.)

Section 37 of the Judicial Code, 28 U.S. C.A. § 80, provides: "If in any suit commenced in a district court, or removed from a State court to a district court of the United States, it shall appear to the satisfaction of the said district court, at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said district court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this chapter, the said district court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed, as justice may require, and shall make such order as to costs as shall be just."

■ This statute is mandatory in its terms, Bank of Arapahoe v. David Bradley & Co., 8 Cir., 72 F. 867, 872, and it is the duty of a federal court, at every stage of proceedings pending before it, to examine into the question as to whether it has jurisdiction over the subject matter and parties to such proceedings, and, whenever it becomes satisfied that it lacks such jurisdiction, it must immediately take cognizance thereof and refuse to proceed further, regardless of the absence of objection by any of the parties, and even if all the parties are willing to waive such objection. Kelley v. United States, D.C.Mich., 59 F.2d 743. See also Morris v. Gilmer, 129 U.S. 315, 9 S.Ct. 289, 32 L.Ed. 690; Weintraub v. Fitzgerald Bros. Brewing Co., D.C.N.Y., 40 F.Supp. 473; Allen v. Clark, D.C.Cal., 22 F.Supp. 898.

Section 37 of the Judicial Code was under consideration in St. Paul Mercury Indemnity Co. v. Red Cab Co., supra. The following appears in a footnote, 303 U.S. at pages 287 and 288, 58 S.Ct. at page 589, 82 L.Ed. 845 in that case: "Prior to 1875 the courts did not act of their own motion, but upon a motion to dismiss or a plea in abatement. Smith v. Kernochen, 7 How. 198, 12 L.Ed. 666; McNutt v. General Mo-

tors Acceptance Corporation, 298 U.S. 178, 183, 56 S.Ct. 780, 782, 80 L.Ed. 1135. Since then it has been their duty not only to act upon a motion to dismiss, (Steigleder v. McQuesten, 198 U.S. 141, 25 S.Ct. 616, 49 L.Ed. 986) or, if the state practice permits, upon a denial of jurisdiction in the answer, (Gilbert v. David, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360; North Pacific S. S. Co. v. Soley, 257 U.S. 216, 42 S.Ct. 87, 66 L.Ed. 203) but to act sua sponte (McNutt v. General Motors Acceptance Corporation, supra, 298 U.S. 178, 184, 56 S.Ct. 780, 782, 80 L.Ed. 1135) upon any disclosure, whether in the pleadings or the proofs, which satisfies the court, in the exercise of a sound judicial discretion, that the plaintiff did not in fact have a claim for the jurisdictional amount or value, and knew, or reasonably ought to have known, that fact. Williams v. Nottawa, 104 U.S. 209, 211, 26 L.Ed. 719; McNutt v. General Motors Acceptance Corporation, supra, 298 U.S. 178, 184, 56 S.Ct. 780, 782, 80 L.Ed. 1135. It is plaintiff's burden both to allege with sufficient particularity the facts creating jurisdiction, in view of the nature of the right asserted, and, if appropriately challenged, or if inquiry be made by the court of its own motion, to support the allegation. McNutt v. General Motors Acceptance Corporation, supra, 298 U.S. 178, at pages 182–189, 56 S.Ct. 780, 782–785, 80 L. Ed. 1135; KVOS v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183. Even an appellate court must notice the absence of the elements requisite to original jurisdiction or to a removal. (Citing cases.)" In McNutt v. General Motors Acceptance Corporation, 298 U.S. 178, at page 184, 56 S.Ct. 780, at page 782, 80 L.Ed. 1135, Chief Justice Hughes said: "The Act of 1875, in placing upon the trial court the duty of enforcing the statutory limitations as to jurisdiction by dismissing or remanding the cause at any time when the lack of jurisdiction appears, applies to both actions at law and suits in equity. The trial court is not bound by the pleadings of the parties, but may, of its own motion, if led to believe that its jurisdiction is not properly invoked, *inquire into the facts as they really exist.* (Citing cases.)" (Emphasis added.)

■ Inquiring into the facts as they really exist with respect to this action as brought for the benefit of the individual plaintiffs, it is inconceivable under the evidence that these plaintiffs, individually, could have reasonably and in good faith claimed, when the complaint was filed, that they were entitled to recover the minimum statutory amount. In view of the evidence establishing that the interest of one of the plaintiffs, who incidentally was not the one appearing at the trial, in the fund sought to be recovered amounts to about $7.40, and that the other plaintiff has no interest in this fund, it is a legal certainty that the allegations of the jurisdictional amount in controversy are, as respects the individual plaintiffs, colorable and fictitious to confer jurisdiction and clearly beyond any expectation of recovery. This conclusion finds further support in testimony from which it must be inferred that the action was in truth instigated by the corporate plaintiff's president.

Having concluded from the evidence in relation to the action as brought for the benefit of the individual plaintiffs that there could not have been a good faith and reasonable expectation of recovery by these plaintiffs of the minimum statutory amount when the complaint was filed, the court must dismiss the action sua sponte for lack of jurisdiction in so far as it has been brought for their benefit. See Holden v. Utah & M. Machinery Co., C.C.Utah, 82 F. 209, writ of error dismissed 8 Cir., 97 F. 983.

In its inception and during the time of the acts of which the plaintiffs now complain, the corporate plaintiff was a fiction created as an instrumentality in the hands of Enrique V. Anaya for the purpose of carrying out his personal plan and scheme to defraud the defendant, the policyholders, and the government of Mexico, and to personally and fraudulently acquire the defendant's business in that country. The parties to this action did not plead or prove the law of Mexico with respect to whether a corporate entity will be disregarded when it has been used as an instrumentality for the perpetration of fraud.

■ Federal courts do not take judicial notice of the laws of foreign countries, Dainese v. Hale, 91 U.S. 13, 23 L.Ed. 190;

Hanley v. Donoghue, 116 U.S. 1–4, 6 S.Ct. 242, 29 L.Ed. 535; Liverpool & Great Western Steam Co. v. Phenix Insurance Company, 129 U.S. 397–445, 9 S.Ct. 469, 32 L.Ed. 788; United States ex rel. Jelic v. District Director of Immigration and Naturalization, Ellis Island, New York Harbor, 2 Cir., 106 F.2d 14; Rowan v. Commissioner of Internal Revenue, 5 Cir., 120 F.2d 515, and when the law of a foreign nation is not pleaded and proved, it will be presumed to be the same as the law of the forum. A similar rule exists in the state courts of Nebraska, where it is held that if the law of another state is not pleaded and proved, it will be presumed to be the same as the law of Nebraska. This rule applies to both statutes and law as established by judicial decisions. Haggin v. Haggin, 35 Neb. 375, 53 N.W. 209; Stark v. Olsen, 44 Neb. 646, 63 N.W. 37; Welton v. Atkinson, 55 Neb. 674, 76 N.W. 473, 70 Am.St.Rep. 416; Franks v. Horrigan, 120 Neb. 1, 231 N.W. 27; National Fidelity Life Insurance Co. v. Gordon, 130 Neb. 130, 264 N.W. 155; Banks v. Metropolitan Life Insurance Co., 142 Neb. 823, 8 N.W.2d 185; In re Application of Blackwell, 145 Neb. 256, 16 N.W. 2d 158.

 Generally, a corporation and its stockholders are regarded as separate legal entities, even if all of the stock is owned by one person. See State ex rel. Sorensen v. Weston Bank, etc., 125 Neb. 612, 251 N.W. 164, but under both federal and local state decisions a court of equity, looking through form to realities, will disregard the corporate entity and deal with the individuals when the corporation is used as a means for perpetrating fraud or other wrong. J. J. McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590; Chicago Milwaukee & St. Paul Railway Co. v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; Darling Stores Corporation v. Young Realty Co., 8 Cir., 121 F.2d 112; Edward Finch Co. v. Robie, 8 Cir., 12 F.2d 360; Hamilton Ridge Lumber Sales Corporation v. Wilson, 4 Cir., 25 F.2d 592; Dickenson v. Schee, 7 Cir., 4 F.2d 483; In re Clear Lake Beach Co., D.C.Cal., 12 F.Supp. 250; In re Rieger, Kapner & Altmark, D.C.Ohio, 157 F. 609; Ehlers v. Bankers Fire Ins. Co., 108 Neb. 756, 189 N.W. 159; National Mortgage Loan Co. v. Hurst, 120 Neb. 37, 231 N.W. 519; State ex rel. Sorensen v. Weston Bank etc., supra; Massachusetts Bonding & Ins. Co. v. Master Laboratories, Inc., 143 Neb. 617, 10 N.W.2d 501.

The rule is well stated in the opinion by Circuit Judge Van Valkenburgh in Darling Stores Corporation v. Young Realty Co., supra, 121 F.2d at page 116: "And courts will ignore the fiction of corporate legal entity when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud. Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487. In such cases "the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require.' United States v. Reading Co., 253 U.S. 26, 63, 40 S.Ct. 425, 434, 64 L.Ed. 760, and cases cited."

The following language from the opinion by District Judge St. Sure in the case of In re Clear Lake Beach Co., supra, 112 F.Supp. at page 253, is approved here: "Moreover, it is a well-established rule both of law and equity that, under certain circumstances, 'when necessary to circumvent fraud, protect the rights of third persons, and accomplish justice,' courts 'will look through form to substance' (Bryan v. Banks, 98 Cal.App. 748, 754, 277 P. 1075, 1078), and, if the occasion demands it, recognize the acts of individuals as being those of corporations, and those of corporations as being those of individuals, to the end that equity and justice may be done unto all concerned."

The writer of a recognized text on the law of private corporations says: "In cases of fraud, whether actual or constructive, the courts regard the real parties responsible, granting relief against them or denying their claims and defenses because of it; and this is especially true in equity * * * The courts have uniformly held, however, that the corporate entity will be disregarded when it is asserted as a means of fraud, and will disregard it to let in de-

fenses of fraud. Constructive fraud is enough. * * *"

Fletcher's Cyc. of Law of Private Corporations, Permanent Edition, Vol. 1, Section 44.

■ The corporate entity now represented by the plaintiff, La Protectora, S. A., was clearly a fiction created in the hands of Enrique V. Anaya as an instrumentality to enable him to perpetrate a fraud upon the defendant, the government of Mexico, and the defendant's policyholders in that country, and to personally and fraudulently acquire the defendant's Mexican business. Under the law established by the foregoing authorities, equity will disregard this corporate entity in the interests of justice and to prevent its use in promoting a further wrong against the defendant. In other words, as between these parties and for the purposes of the instant case, the court will look through the cloak of the corporation to Anaya and consider the case in that light. Anaya, as the original wrongdoer and creator of the fraudulent corporation, would have no standing to maintain this action, and the corporate plaintiff now stands in his shoes as respects any claim for reimbursement by the defendant for the fraud practiced by Anaya.

The court has heretofore concluded under the evidence in this case that the corporate plaintiff cannot join its policyholders with itself for the purpose of bringing this suit as a class action. Likewise, the court has concluded that neither the corporate plaintiff nor the individual plaintiffs have any standing to maintain the action, either for their own benefit or as representatives of a class. While it is not expressly claimed by the plaintiffs that the action is being brought for the benefit of the corporate plaintiff's stockholders, a full and mature consideration of the evidence prompts the court to reach the conclusion that the action is in reality one brought in the name of the corporation and the two individual plaintiffs for the benefit of the stockholders.

Under the facts as found by the court, the present stockholders acquired their stock long after the commission of the fraud to which we have referred. (That Anaya may still own 67 shares through his guardian is not overlooked.) This raises the question of the right of the corporate plaintiff's stockholders to maintain an action, either in the name of the corporation or in their own name, to recover for the injuries of which they now complain.

■ Whether we follow the rule that ownership of stock in a corporation and the interests and rights of a purchaser thereof must be determined by the law of the place of incorporation, see United Cigarette Machine Co., Inc., v. Canadian Pacific R. Co., 2 Cir., 12 F.2d 634, or the rule that ownership of stock in a corporation depends upon the law of the place where it is transferred, see Direction Der Disconto-Gesellschaft v. United States Steel Corporation, etc., 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495, the right to maintain this action as one for the benefit of the corporate plaintiff's stockholders depends upon the law of Mexico, Gallup v. Caldwell, 3 Cir., 120 F.2d 90, since that is the place where the corporate plaintiff was organized and where its present stockholders acquired their stock. But that law has not been pleaded or proved in this case.

The law of Nebraska as to the right of stockholders to maintain an action for the redress of wrongs committed against the corporation prior to the time when such stockholders acquired their stock has long ago been settled in an opinion by Dean Pound, whose great learning in the law will not be questioned. In Home Fire Insurance Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716, an action in the name of the corporation was brought against its former stockholders and officers to recover sums allegedly lost through their mismanagement. Those who owned the plaintiff's stock at the time when the action was brought did not own the stock when the alleged wrongs were committed.

Dean Pound, then sitting as a Commissioner of the Supreme Court of Nebraska, considered the authorities on both sides of the question, and 67 Neb. at pages 656 and 657, 93 N.W. at page 1028, 60 L.R.A. 927, 108 Am.St.Rep. 716 said: "Sound reason and good authority sustain the rule that a purchaser of stock cannot complain of the prior acts and management of the corpor-

ation. Hawes v. Contra Costa Water-Works Co., 104 U.S. 450, 26 L.Ed. 827; Dimpfel v. Ohio & M. R. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L.Ed. 121; Taylor v. Holmes, 127 U.S. 489, 8 S.Ct. 1192, 32 L.Ed. 179; Southwest Natural Gas Co. v. Fayette Fuel-Gas Co., 145 Pa. 13, 23 A. 224; Alexander v. Searcy, 81 Ga. 536, 8 S.E. 630, 12 Am.St.Rep. 337; Clark v. American Coal Co., 86 Iowa 436, 53 N.W. 291, 17 L.R.A. 557; United Electric Securities Co. v. Louisiana Electric Light Co., C.C., 68 F. 673; Venner v. Atchison, T. & S. F. R. Co., C.C., 28 F. 581; Heath v. Erie R. Co., 8 Blatchf. [316], 347, Fed.Cas. No. 6,306; Dannmeyer v. Coleman, C.C., 11 F. 97, 8 Sawy. 51; Pennsylvania Tack Works v. Sowers, 2 Walk. [Pa.] 416; 4 Thomp. Corp. § 4569. In Alexander v. Searcy, supra, the court say (81 Ga. at page 550, 8 S.E. 630 ): 'The weight of authority seems to be that a person who did not own stock at the time of the transactions complained of cannot complain or bring a suit to have them declared illegal.' In United Electric Securities Co. v. Louisiana Electric Light Co. it is said (68 F. at page 675): 'As a general proposition, the purchaser of stock in a corporation is not allowed to attack the acts and management of the company prior to the acquisition of his stock; otherwise, we might have a case where stock duly represented in a corporation consented to and participated in bad management and waste and, after reaping the benefits of such transactions, could be easily passed into the hands of a subsequent purchaser who could make his harvest by appearing and contesting the very acts and conduct which his vendor had consented to.' These remarks are not without application to the case at bar. The present shareholders are all subsequent purchasers. They obtained their stock through the defendant Barber. They hold a large number of their shares under a purchase from him and his associates through the very mismanagement now complained of. A majority of the remaining shares come directly from Barber and his associates in the wrongs upon which this suit is based. In other words, the present stockholders are contesting acts through which they get title to a large portion of their stock, and acts which those through whom they derived the greater part of the remainder could not have challenged because they participated therein, and, by contesting these acts, which did not injure any of the present stockholders in the least, are recovering back a large part of the purchase price of stock which was admittedly worth all that they paid for it. Such cases illustrate forcibly the wisdom of confining complaints of this kind to those who were stockholders at the time or their successors by operation of law."

The Dean said, 67 Neb. at page 661, 93 N.W. at page 1030, 60 L.R.A. 927, 108 Am. St.Rep. 716: "It appears to be well settled, also, that stockholders who have acquired their shares and their interest in the corporation from the alleged wrongdoers and through the prior mismanagement have no standing to complain thereof." (Citing cases.)

I quote further from the opinion in 67 Neb. at page 664, 93 N.W. at page 1031, 60 L.R.A. 927, 108 Am.St.Rep. 716: "Conceding, then, that all of the present stockholders are so circumstanced that no relief should be afforded them in a court of equity, may the corporation recover, notwithstanding? We think not." After reviewing and considering a number of cases, the Dean expressed his conclusions in the following clear and concise language at pages 669 and 670 of 67 Neb., at page 1033 of 93 N.W., 60 L.R.A. 927, 108 Am.St.Rep. 716: "Hence, we think the rule to apply to such cases is this: Where a corporation is proceeding at law, or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover. This rule finds many illustrations in the authorities."

The opinion of Dean Pound in the Home Fire Insurance Co. case has never been overruled or questioned in Nebraska, and the federal cases cited in that part of his opinion previously quoted in this memorandum have never been overruled or otherwise questioned. (Cf. Rule 23(b) of the Feredal Rules of Civil Procedure requiring that the complaint in a stockholder's derivative action aver that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law.) While a contrary rule as to the right of stockholders to maintain actions for prior wrongs to the corporation may prevail in some states, see 148 A.L.R. 1090, note at p. 1094 et seq., Dean Pound's opinion has been cited and quoted with approval in innumerable cases, both in state and federal courts. The opinion having been written in 1903, when the Nebraska statute providing for the Supreme Court Commission did not contain the "unofficial" provision, this court now has no hesitancy in accepting the views expressed therein as persuasive indicia of local state law. See West v. American Tel. & Tel. Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L.R. 956.

The corporate plaintiff's president and majority stockholder, Otto, is a person of extensive education and experience in business, and particularly in the field of insurance. His own testimony establishes that he had been employed by Anaya and placed in charge of the industrial branch of the corporate plaintiff's insurance business in 1935, and that, after having been so employed for three or four years, Otto bought the majority of the stock in the corporation without making any inquiry whatsoever as to its previous history. We hold, both as a matter of fact and as a matter of law, that he either knew or by the exercise of reasonable diligence should have known of facts and records sufficient to have put him on inquiry as to the fraud which had been committed in the organization of the corporation.

In Empson v. Deuel County State Bank, 134 Neb. 597, at pages 604 and 605, 279 N.W. 293, at page 297, the Supreme Court of Nebraska said: "However, it is also the law that a purchaser of corporate stock, with notice of latent equities between the prior parties, or with notice of facts sufficient to put him on inquiry, takes the title thereto subject to such equities.

"This rule is discussed in 12 Fletcher, Cyclopedia Corporations (Perm.ed.) 274, § 5479, under the heading, 'Who are bona fide purchasers for value and without notice,' and states: 'In order that a purchaser of stock may acquire a title free from secret liens in favor of the corporation, or latent equities between prior parties, he must be in the position of a bona fide purchaser for value. He takes subject to such liens or equities if he has notice of them at the time of his purchase, or notice of facts sufficient to put him on inquiry, or if he is not a purchaser of the stock for value.""

Whether and to what extent, if any, the above rules may have been changed in Nebraska by the adoption of the Uniform Stock Transfer Act, R.S.Nebr. '43, sec. 21-201 to 21-224 inclusive, need not now be determined, since this Act was not passed until 1941 and has no extra-territorial application. See Fletcher's Cyc. of Law of Private Corporations, Permanent Edition, Vol. 12, Sec. 5542.

In view of the rules established in Home Fire Insurance Co. v. Barber, supra, and Empson v. Deuel County State Bank, supra, this court must hold that neither the corporate plaintiff's present stockholders nor the corporation itself, in behalf of those stockholders, can maintain this action.

While it is not necessary to the decision in this case, brief comment will be addressed to certain contentions which have been urged by the plaintiffs but which have not been previously touched upon in this memorandum.

The plaintiffs seriously contend that since Anaya was the defendant's general agent in Mexico, and authorized to represent the defendant in complying with the insurance laws of that country, the defendant is therefore chargeable with any and all of his acts. Since the defendant's liability for acts performed by Anaya in Mexico depends upon the law of that country, Restatement of the Law of Conflict of Laws, Section 387; see also New York Life In-

surance Co. v. Chapman, 8 Cir., 132 F.2d 688, certiorari denied 319 U.S. 749, 63 S.Ct. 1158, 87 L.Ed. 1704, and since there has been no pleading or proof as to the law of Mexico concerning a principal's liability for fraud committed by his agent, these contentions will be considered in the light of local law.

■ The plaintiffs have failed to recognize the distinctions between a principal's liability for lawful acts of his agent and the principal's liability for his agent's acts which are partly lawful and partly unlawful and fraudulent. Although a principal is liable to third persons for the torts of his agent when committed in the course and within the scope of the agency, even if the principal did not authorize, participate in, or ratify the tort, the principal is not liable where the tortious act was committed, not in the furtherance of the principal's business, but for purposes personal to the agent. Burchmore v. H. M. Byllesby & Co., 140 Neb. 603, 1 N.W.2d 327; Division No. 1 Railway Employees' Department of American Federation of Labor v. American State Bank, 113 Neb. 196, 202 N.W. 632.

■ In the language of Circuit Judge Taft: "The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." Thomson-Houston Electric Co. v. Capitol Electric Co., 6 Cir., 65 F. 341-343. See also Missouri State Life Ins. Co. v. Keyes, D.C. Ky., 46 F.Supp. 181, reversed on other grounds 6 Cir., 69 F.2d 794; Schneider v. Thompson, 8 Cir., 58 F.2d 94; Bank of Overton v. Thompson, 8 Cir., 118 F. 798; Adler v. New York Life Ins. Co., 8 Cir., 33 F.2d 827.

■ The evidence in this action warrants the inference that the fraud practiced by Anaya was primarily against the defendant, and then incidentally against third parties. To now hold as a matter of law that the defendant, as principal, is chargeable with notice or knowledge of the fraud perpetrated against itself by Anaya would be most outrageous reasoning. A copy of Anaya's power of attorney to represent the defendant in Mexico was not offered in evidence at the trial of this case. The court, however, is convinced after considering the evidence and the law that Anaya and Guerrero, in carrying out their conspiracy and plan to cheat and defraud the defendant, were acting not in the capacity of representing the defendant but in a personal capacity for themselves and to further their own fraudulent interests. Hence, notice or knowledge of their fraudulent acts is not imputed to the defendant, and the latter is not liable for those acts. In reaching this conclusion, the court does not overlook or ignore language in the recital of proceedings of the meeting of the defendant's board of directors in Omaha referring to the resolution adopted by the defendant's Sovereign Camp, and stating that pursuant thereto the defendant's president had: "directed and authorized the Hon. E. V. Anaya, General Agent of this Association in the Republic of Mexico and in said Mexican jurisdiction, to institute negotiations and to make legal and practical arrangements by which said Mexican business could be reinsured or assigned to some other insurance company authorized to carry on an insurance business in the Republic of Mexico, or to organize an insurance corporation in the Republic of Mexico that would be authorized to take over and accept a transfer of said business. from the Sovereign Camp of the Woodmen of the World as provided by the insurance laws of the Republic of Mexico, and thereby release and relieve the Sovereign Camp of the Woodmen of the World from any and all liability at the present and in the future by reason of the certificates of insurance contracted and now held in Mexico * * *"

■ The plaintiffs in good faith, but mistakenly, contend that by reason of the language of this resolution Enrique V. Anaya was acting as the defendant's agent in organizing the corporate plaintiff and that consequently the defendant is liable for his fraud and other wrongdoing. This position is not well founded under the facts in this case. In determining the meaning of the language appearing in the above resolution, we think that it is per-

missible to ascertain and consider the circumstances under which this language was used. See Ford Motor Co. v. Dexter, 2 Cir., 56 F.2d 760. It may not be denied that the defendant, for proper and lawful reasons, wanted to dispose of its business in Mexico and get out of that country. Under these circumstances and in view of that desire by the defendant, this resolution and the acts of the defendant's president pursuant thereto amounted in sum and substance to an instruction to Anaya to dispose of the defendant's Mexican business. In the event that he was unable to do so, the defendant and its president then gave their consent to Anaya personally taking over the business by organizing a lawful corporation for that purpose. The thought that Anaya, in organizing the corporation, was acting as an agent for the defendant is clearly precluded by undisputed evidence that the defendant wanted to sell its Mexican business and withdraw from that country.

To certain evidence which was offered by the plaintiffs during the course of the trial, the defendant interposed objections on the ground that such evidence was incompetent, immaterial and not binding on the defendant. The court's ruling on these objections was reserved. Because of the bases of the court's decision, it has not been deemed necessary to consider this evidence or the objections thereto.

### Conclusions of Law

1. The interest of the individual plaintiffs as shown by the evidence is not sufficient to entitle them to maintain this action.

2. The interest of the corporate plaintiff as shown by the evidence is not sufficient to entitle it to bring or maintain this action, either for its own benefit or for the benefit of its stockholders.

3. Neither the corporate plaintiff nor the individual plaintiffs can maintain this suit as a class action.

4. The alleged fraud is, under the evidence, the fraud of Enrique V. Anaya and his confederates individually and not the fraud of the defendant, and the defendant is not chargeable for this fraud.

5. The corporate plaintiff was created and operated by Enrique V. Anaya as an instrument under his sole control and management for the purpose of assisting and carrying out his scheme and plan to cheat and defraud.

6. Under the circumstances, the court now looks through and disregards the legal entity of the corporate plaintiff to prevent the perpetration of fraud as undertaken, and now lodges this fraud, for the purposes of this decision, where it belongs.

7. This action should be dismissed at the costs of the plaintiff.

An order will issue directing the clerk to enter judgment in accordance herewith.